**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| GO FAN YOURSELF, LLC,<br><br>Plaintiff,<br><br>v.<br><br>UV PARTNERS, INC. d/b/a UV ANGEL,<br><br>Defendant. | Case No. 1:25-cv-00644<br><br>Hon. Robert J. Jonker |

**PLAINTIFF GO FAN YOURSELF, LLC'S OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**


I. INTRODUCTION ..... 1

II. THE PATENTS IN SUIT ..... 2

III. THE UV ANGEL PRODUCT ..... 7

IV. CLAIM CONSTRUCTION ..... 9

V. THE PROPOSED CONSTRUCTIONS BY DEFENDANT IMPROPERLY NARROW THE CLAIMS OF THE GFY PATENTS ..... 10

A. "Fan portion" / "a fan positioned in the fan portion" ..... 12

B. "a UV-shield adapted to block UV light generated by the UV light source from exiting the first airway" / "a UV light shield attached to the first airway to block UV light from exiting the airway" / "a UV light screen positioned in the air chamber shielding the UV rays emitted from the UV light source from exiting the air chamber" / "a light protection plate positioned in proximity to an exit of the kill chamber at the vent to prohibit the UV light emitted from the UV-C light source from exiting the kill chamber" ..... 16

C. "housing" / "a baffle, mounted to the housing" / "a baffle" ..... 19

D. "lower baffle configured the size of a ceiling tile" / "face-plate configured the size of a ceiling tile" / "housing configured in the shape of a housing ceiling tile" ..... 21

VI. "wherein air from the fan enters the air chamber and proceeds through the vent" / "wherein air from the fan enters the air chamber and proceeds through a vent" ..... 23

VII. CONCLUSION ..... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Beckson Marine v. Nfm, Inc.*,
292 F.3d 718 (Fed. Cir. 2002)....1

*Brown v. 3M*,
265 F.3d 1349 (Fed. Cir. 2001)....9

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002)....9

*Dayco Prods. v. Total Containment, Inc.*,
258 F.3d 1317 (Fed. Cir. 2001)....15

*Duncan Parking Techs., Inc. v. IPS Grp., Inc.*,
914 F.3d 1347 (Fed. Cir. 2019)....10

*Fenner Invs., Ltd. v. Cellco P'ship*,
778 F.3d 1320 (Fed. Cir. 2015)....9

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014)....19

*Laitram Corp. v. NEC Corp.*,
163 F.3d 1342 (Fed. Cir. 1998)....19

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004)....15, 18

*Malvern Panalytical Inc. v. TA Instruments-Waters LLC*,
85 F.4th 1365 (Fed. Cir. 2023) ....23

*Markman v. Westview Instr., Inc.*,
517 U.S. 370 (1996)....9

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
521 F.3d 1351 (Fed. Cir. 2008)....10

*Phillips v. AWH Corp.*,
415 F.3d 1321 (Fed. Cir. 2005)....9, 10, 12, 21

*Poly-Am., L.P. v. API Indus., Inc.*,
839 F.3d 1131 (Fed. Cir. 2016)....10

*Starhome GmbH v. AT&T Mobility LLC*,
743 F.3d 849 (Fed. Cir. 2014)....................................................................................1

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002)..................................................................................9

*Thorner v. Sony Comput. Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)...................................................................10, 15, 23

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
200 F.3d 795 (Fed. Cir. 1999)....................................................................................9

*Water Tech., LLC v. Kokido Dev. Ltd.*,
2019 U.S. Dist. LEXIS 42420 (E.D. Mo. Mar. 15, 2019) ........................................................10

## I. INTRODUCTION

This case involves the problem of treating contaminated air inside a closed environment such as a school room, a hospital room, or an office. (Ex. A, '141 Patent, col. 1:14-39). To overcome the problem, Darrin Niemiec and William Carlson of Go Fan Yourself, Inc. ("GFY"), invented a device that may be installed as part of a ceiling tile grid. The device includes a UV light treatment chamber formed by a housing which serves to decontaminate the air and a fan which circulates air from a room through the UV light treatment chamber. (Ex. A, '141 Patent, col. 3:34-53). The treatment chamber incorporates a UV light source that operates to kill viruses, bacteria, and fungi. (*Id.*). The inventions also have a UV light shield that prohibits UV light from exiting what is referred to as the kill chamber. (Ex. B,'026 claim 1). The claims of the patents relating to the air purification system recite elements such as "housing," "fan portion," "UV screen," and "configured the size of a ceiling tile."

This case is in the claim construction phase of litigation. There is a strong presumption during claim construction that claim terms are to be given their ordinary and customary meaning. *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014). Defendant ignores this basic canon of claim construction by presenting an array of proposed limiting definitions to simple terms such as "housing," "fan portion," "UV screen," and "configured the size of a ceiling tile." (Ex. C, UV Partners Proposed Claim Construction). Defendant's proposed constructions impermissibly add words and structures to the claim language, ignoring the ordinary and customary meaning of those terms. *Beckson Marine v. Nfm, Inc.,* 292 F.3d 718, 723 (Fed. Cir. 2002). For example, Defendant proposes that the term "a lower baffle includes a fan portion" should be construed to mean "a passage extending through and defined by the lower baffle, the passage being configured to receive a fan within the passage." (Ex. C, UV Partners Proposed Claim Construction, pp. 4-5). Defendants also seek a limitation of the term "a UV light screen positioned

in the air chamber shielding the UV rays" to include "a protruding barrier at an exit of the air chamber." (*Id.* at pp. 5-6). The claim language says nothing about a "protruding barrier." Defendant ignores the basic canon of claim construction that a claim term should take on its ordinary meaning unless the patentee demonstrates a clear intent to deviate from that meaning.

Defendant's proposed alteration of the plain words of the claims should be rejected in favor of the plain and ordinary meaning of the claim elements.

## II. THE PATENTS IN SUIT

GFY owns United States Patent Nos. 10,316,141 ("the '141 Patent") (Ex. A), U.S. Patent No. 10,670,026 ("the '026 Patent") (Ex. B), U.S. Patent No. 11,028,223 ("the '223 Patent") (Ex. D), U.S. Patent No. 11,255,336 ("the '336 Patent") (Ex. E), U.S. Patent No. 11,332,573 ("the '573 Patent") (Ex. F) (collectively the "GFY Patents"). The '026 and '336 Patents relate to the original embodiment of the invention shown in Figures 1-17. (Exs. B and E). The '141, '223 and '573 Patents include the additional embodiments shown in Figs. 18-20 which derive from a continuation-in-part application. (Exs. A, D, and F). The embodiments are discussed in detail below.

GFY's Patents address the problem of purifying air within indoor environments:

> Further, in an office or indoor environment, the absence of adequate ventilation causes irritating or harmful contaminants to accumulate, which causes worker discomfort, health problems and reduced performance levels. Such harmful contaminants include mold or viruses that can cause people to become sick.

(Ex. B, '026 Patent, col. 14:26-32; Ex. F, '573 Patent col. 14:17-24).

> There is also a need to create what is called a virus or bacteria kill chamber. The kill chamber, or kill zone, must be self-enclosed such that any UV light source does not exit the kill chamber.

(Ex. A, '141 Patent col. 2:39-42). The inventors appreciated the fact that "UV light can be harmful to humans and/or animals (particularly over prolonged durations)." (Ex. B, '026 Patent col. 13:9-

11).

The GFY Patents relate to a fan and UV light system to decontaminate air while implementing shields or screens that prevent exposure of UV light into its surrounding area. The GFY inventions function to kill various forms of bacteria, viruses and molds -- while protecting the people from the dangers created by the UV light source:

> The inventions include an air purifying device, comprising: a ceiling tile having at least one vent; a fan mounted to the ceiling tile; a baffle defining at least a first airway between the fan and the vent; and at least a first UV light source mounted in the first airway, wherein the first airway accommodates a UV-reflective material in at least a portion of the first airway; and wherein a first UV-screen is attached to the first airway to block UV light from exiting the airway.

(Ex. E, ’336 Patent, col. 3:15-22).

The original embodiment of the UV light chamber invention in the ’336 and ’026 Patents was shown in FIG. 16B depicting the upper and lower baffles forming the air chamber, the fan, the UV light and the UV shield:




*Figure 16B*

(Ex. E, ’336 Patent, FIG. 16B, col.12:34-37: “an upper baffle 1610 and one or more lower baffles 1620, 1621, may act together to define one or more airways”). The upper baffle and lower baffle form the air chamber which incorporates the UV light source positioned therein: “FIG. 16B

illustrates exemplary UV light source(s) 1640 which are mounted inside the upper baffle 1610 and thus irradiate organic matter residing in the air as air flows from the fan to the vent." (Ex. E, '336 Patent, col. 13:20-22). The invention also teaches that the UVC light chamber is "self-enclosed" since exposure of UVC light to humans may be harmful: "The kill chamber, or kill zone, must be self-enclosed such that any UV light source does not exit the kill chamber." (Ex. F, '573 Patent col. 2:63-67).

In the Notice of Allowance ("NOA") for the '336 Patent, the United States Patent and Trademark Office ("USPTO") recognized the novelty of the claims:

> specifically comprising the limitation directed to an air inlet in the housing wherein air from the fan enters the air chamber and proceeds through a vent; a UV light source capable of emitting UV light rays positioned in the air chamber; and a UV light screen positioned in the air chamber shielding the UV rays emitted from the UV light source from exiting the air chamber, in combination with the remaining limitations.

(Ex. G, '336 Patent NOA, p. 3; see also Ex. H, '026 Patent NOA). There was no mention by the USPTO of a "fan…positioned in a passage extending thought and defined by the recessed fixture," "a protruding barrier at the exit," "within" or the like, as proposed by Defendant. (*Id.*). The USPTO applied the plain and ordinary meaning of the claim terms in allowing the patents to issue. (*Id.*).

Additional embodiments of the air purification inventions were added to the '141, '223, and '573 Patents which included a series of continuation-in-part applications based on the same applications that led to the '026 and '336 Patents. The embodiment in the continuation-in-part application included an upper baffle and lower baffle defining an airway between the fan and the vent and at least a first UV light source mounted in the first airway:




The series of barriers (guide members) operate to block the UV light from exiting the air chamber:

> The present invention further addresses the need to contain the light emitted from a UV-C light source within the chamber to create the kill zone. An extensive system of barriers is utilized within the kill chamber to create a kill zone while precluding the UV-C light from exiting the kill chamber.

(Ex. A, '141 Patent col. 3:18-25, 3:46-53). The specification describes that "as seen in FIG. 20A, which is a cut-away side view of embodiments of the inventions, upper baffles 2010, 2011 and one or more lower baffles 2020, 2021, may act together to define one or more airway(s). (*Id.* at col. 14:44-48). "[A]ir may pass from a fan 2002, along airway(s) 2030, 2031 (e.g. a first airway to the left and a second airway to the right), to vents 2003." (*Id.* at col. 14:47-50). The UV light operates to "irradiate" the air in the airway. (*Id.* at col. 15:32-35). An important feature of the invention is the irradiation zone of the kill chamber formed by the upper and lower baffles:

> the advantage of creating a "kill chamber," or "kill zone" inside the airways 2030 and 2031, where UV rays may be deflected within the kill chamber to increase their exposure to air passing through the airways 2030 and 2031, and by extension, increase the irradiation of organic matter contained in the air. Furthermore, in the embodiment of FIGS. 20A and 20B, the baffles 2040, 2042 and 2044 located in airways 1630 and/or 1631 operate to (1) shield UV rays from exiting the airways and entering an environment (such as a room or commercial space)…

(Ex. A, '141 col. 15:50-16:1; Ex. F, '573 Patent col. 14:17-24).

The specification further explains that the various embodiments of the inventions may be configured to fit into a ceiling tile grid:

Fig. 19




Fig. 10




(Ex. A, ’141 Patent, Ex. E, ’336 Patent, col. 2:40-41: “it would be advantageous for an air circulation mechanism to fit within the footprint of a typical ceiling tile.”).

With respect to the ’141 Patent, the USPTO explained that the invention was patentable because there was no prior art of record that taught all the elements of the claimed invention:

> Regarding claim 11, the references of Prior Art of record fails to teach or suggest the combination of the limitations as set forth in claim 11, and specifically comprising the limitation directed to the lower baffle includes a fan portion and a vent portion; an upper baffle adjacent the lower baffle configured to form an air chamber between the lower baffle and the upper baffle; a fan positioned in the fan portion of the lower baffle, wherein said fan directs air between the air chamber and the vent portion, in combination with the remaining limitations.

(Ex. I, NOA, ’141 Patent, p. 1). The NOA for the ’573 Patent stated that the prior art of record did not teach “a baffle positioned in the UV kill chamber to act as a barrier preventing light emitted from the UV light source from exiting the air purifying device.” (Ex. J, NOA, ’573 Patent, p. 2). GFY did not limit the claims during the prosecution. The claims define a structure. There is no need for special interpretation. The USPTO understood the plain and ordinary meaning of the claim terms and applied that meaning to the claims without clarification. The USPTO did not limit the claims to

a "fan" positioned in a passage extending thought and defined by the recessed fixture," "a protruding barrier at the exit," "within" or the like. (See Ex. C).

The prosecution files for each of the GFY Patents are clean. There are not any instances where the USPTO needed guidance regarding the meaning of claim language because the inventors' words were clear and understandable. The inventors did not act as their own lexicographers. There are no instances where the inventors disavowed the scope of any claim terms during prosecution to distinguish any prior art.

The claims of the GFY Patents all recite structure relating to an in-ceiling air-treatment device that circulates air using a fan and irradiates that air with UV-C light within a self-contained chamber, while using shields to block UV light from escaping into the room. (Ex. A, '141 Patent, col. 16:61-17:12, 18:1-14; Ex. D, '223 Patent, col. 1:66-17:1-15, 18:6-19; Ex. F,'573 Patent col. 19:42-57, 20:26-43; Ex. B, '026 Patent, col. 14:12-21, 14:38-49; Ex. E, the '336 Patent col. 14:14-24, 14:46-54, 14:65-15:8).

## III. THE UV ANGEL PRODUCT

UV Partners, Inc. d/b/a UV Angel ("UV Partners" or "Defendant") sells a line of products called the UV Angel Clean Air Device:



(https://www.youtube.com/watch?v=cBmAOnROrSs). Defendant advertises that the "UV Angel Clean Air Active™ is a smart, ceiling-mounted UV-C air treatment solution trusted in healthcare and other key environments…[w]orking independently of HVAC systems, it continuously reduces

bacteria, viruses, and mold while in operation in occupied spaces." (Ex. K, https://uvangel.com/air-series/). "Air is circulated through the UV-C air chamber where it is treated with an enclosed high-intensity UV-C light to reduce the concentration of bacteria, viruses, and fungi in treated air."




(Exs. L, p. 4; M). "Units draw contaminated air into a shielded UV-C chamber where it quickly reduces the concentration of bacteria, viruses, and fungi in treated air…" (Ex. N, p.2):




(Exs. L; M). Clean, treated air is then circulated back into the room.

GFY contends that Defendant's product practices the asserted claims of the GFY Patents.

## IV. CLAIM CONSTRUCTION

The purpose of claim construction is to give claim terms the meaning understood by a person of ordinary skill in the art at the time of the invention. The scope of patent claims is a question of law to be determined by the court. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 384 (1996). The goal of claim construction is to give claim terms the proper meaning so they can set the boundaries of the patented subject matter without changing what was invented. *Fenner Invs., Ltd. v. Cellco P'ship,* 778 F.3d 1320, 1323 (Fed. Cir. 2015). Not all claims require construction. "[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999).

Claim construction begins with a "heavy presumption" that claim terms should be given their plain and ordinary meaning to a person of ordinary skill in the art. *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed. Cir. 2002); *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325 (Fed. Cir. 2002). "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Phillips v. AWH Corp.,* 415 F.3d 1321 (Fed. Cir. 2005). When "the ordinary meaning of claim language as understood by a person of skill in the art [is] readily apparent even to lay judges,...claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314; see also *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001). The presumption of ordinary meaning prevails ***in all but two situations***: (1) "when a patentee acts as his own lexicographer" or (2) "when the patentee disavows the full scope of the claim term in the specification or during prosecution." *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). Neither of those principles apply here.

The Court should begin with the words of the claims and ***should not import limitations from examples or preferred embodiments into the claims***. *Phillips*, 415 F.3d at 1323 (emphasis added). Commonly understood technical terms (e.g., a baffle, vent, airway, and fan) do not require construction. Further, "if giving the language of the term its plain, ordinary meaning resolves the parties' dispute, a court need not engage in claim construction merely to accommodate one party's semantic preference for the use of a particular word or phrase." See *Water Tech., LLC v. Kokido Dev. Ltd.,* 2019 U.S. Dist. LEXIS 42420, at *4-5 (E.D. Mo. Mar. 15, 2019) (citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008)). The inventors chose to use certain language and that language should not be discarded without good reason. *Phillips*, 415 F.3d at 1323.

Courts must not import limitations into a claim term unless a "patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012). That did not occur here. The specification of the patent describes embodiments of the invention which are examples of the invention, and courts have warned against importing limitations from those descriptions into the claims. *Duncan Parking Techs., Inc. v. IPS Grp., Inc.,* 914 F.3d 1347, 1364 (Fed. Cir. 2019).

GFY respectfully requests that the Court give all disputed terms their plain and ordinary meaning and reject the narrowing construction proposed by Defendant.

## V. THE PROPOSED CONSTRUCTIONS BY DEFENDANT IMPROPERLY NARROW THE CLAIMS OF THE GFY PATENTS

The language of the asserted claims of the GFY Patents is clear. The USPTO understood the claim language; it is a straightforward description of structural features. No term in the of the GFY Patents needs to be construed – all terms can be given their plain and ordinary meaning.

Claim construction should begin with words of the claims. Here, the claims define structural features that are self-explanatory. Claim 1 of the ’336 Patent recites the structural components of the claim using plain and ordinary language without specific limitation to the shape, size, or proportions of the claimed elements of the structure:

> An air circulation device, comprising:
>
> a housing configured to be joined to a structure of a building;
> a first fan mounted to the housing;
> a first vent in the housing;
> a baffle, mounted to the housing, and defining at least a first airway between the fan and the first vent;
> a UV kill chamber mounted in the first airway; and
> the UV kill chamber includes a UV light source and a UV-shield adapted to block UV light generated by the UV light source from exiting the first airway.

(Ex. E, ’336 Patent; see also ’026 Patent, claim 1). Claim 14 of the ’223 patent recites the structural components of the claim in a plain and ordinary manner:

> An air purifying device comprising:
>
> a face-plate configured the size of a ceiling tile, wherein the face-plate includes a fan portion and a vent portion;
> a cover attached to the face-plate forming an air chamber between the face-plate and the cover;
> a fan positioned in the fan portion of the face-plate, wherein said fan directs air through the air chamber to the vent portion;
> a UV-C light fixture positioned in the air chamber wherein the UV-C light fixture emits UV light to form a kill zone within the air chamber; and
> a baffle positioned in proximity to the kill zone in the air chamber wherein the baffle is configured to direct air to the kill zone and prohibit the UV light from exiting the kill zone.

(Ex. D, ’223 Patent, claim 14). The same is true of claim 11 of the ’141 Patent:

> An air purifying device comprising:
>
> a lower baffle configured the size of a ceiling tile, wherein the lower baffle includes a fan portion and a vent portion;
> an upper baffle adjacent the lower baffle configured to form an air chamber between the lower baffle and the upper baffle;

a fan positioned in the fan portion of the lower baffle, wherein said fan directs air between the air chamber and the vent portion; and

a UV-C light fixture positioned in the air chamber wherein the UV-C light fixture emits UV light to form a kill zone within the air chamber capable of killing bacteria, viruses or microbes contained in air passing through the kill zone.

(Ex. A, '141 Patent, claim 1).

There is no need to apply anything other than the plain and ordinary meaning to the language of the claims. That should end the analysis. The Federal Circuit in *Phillips* cautioned against construing a claim as being limited to a single embodiment outlined in the patent, as Defendant seeks to do here. 415 F.3d at 1323. This is because an inventor "rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id*.

**A. "Fan portion" / "a fan positioned in the fan portion"**

GFY respectfully submits that the terms "fan portion" and "fan positioned in the fan portion" should be construed to have the plain and ordinary meaning. The claim term fan portion appears in claim 11 of the '141 Patent, claims 1 and 14 of the '223 Patent and claims 1 and 13 of the '573 Patent. (Ex. C p. 4-5, see also Exs. A, D, F). In Defendant's proposed construction of the claim terms "fan portion" and "fan portion in the fan portion," it invites this Court to ignore the plain and ordinary construction of the words and replace the ordinary phrase "fan portion" with much narrower language: "a *passage extending through and defined by the lower baffle*, *the passage being configured to receive a fan within the passage*." (Ex. C, p. 4). Defendant even wants this Court to change the claim element reciting "a fan positioned ***in*** the fan portion" to be construed to mean a fan positioned within the passage as shown in Defendant's proposed construction below:

| # | Claim Terms and Associated Claims | UV Partners' Proposed Constructions |
|---|---|---|
| 1 | "fan portion"<br>'141 Patent, claim 11 (and all dependents thereof) | "a passage extending through and defined by the lower baffle, the passage being configured to receive a fan within the passage" |
| 2 | "fan portion"<br>'223 Patent, claim 1 (and all dependents thereof) | "a passage extending through and defined by the ceiling tile, the passage being configured to receive a fan within the passage" |
| 6 | "a fan positioned in the fan portion"<br>'141 Patent, claim 11 (and all dependents thereof)<br>'223 Patent, claim 1 (and all dependents thereof)<br>'223 Patent, claim 14 (and all dependents thereof)<br>'573 patent, claim 1 (and all dependents thereof)<br>'573 Patent, claim 13 (and all dependents thereof) | "a fan positioned within the fan portion" |

(Ex. C, pp. 4-5).

The claims use the term "portion" to identify a region or limited area of a housing, baffle or plate. That is the plain and ordinary meaning. There is no special meaning in the industry for the term "portion." The definition of the term "portion" is "a part or limited quantity of anything." (Ex. O, Webster's New World College Dictionary (3rd ed. 1988)). The "fan portion" is simply the area where the fan is positioned. The use of the term "portion" in the claim does not differ from the standard use of the term. There is nothing in the claims or the intrinsic evidence that would require the additional limitation of "a passage extending through and defined by… the passage being configured to receive a fan within the passage" as proposed by Defendant. The claim language is simple. The language of the claims of the GFY Patents defines a "portion" or limited region in a structure, i.e., of the lower baffle, faceplate, or housing where the fan is located. No construction is required.

The claim language is clear and is consistent with the specification. The GFY Patents shows "a fan mounted to the ceiling tile." (Ex. E, '336 Patent, col. 3:15-22). The fan is mounted in the area designated as the fan portion. "The important feature of the fan 30 is to move and distributes air within the fan area, regardless of the type of fan that was used." (*Id*. at col. 6:30-32). The specifications of the GFY Patents describe the purpose of the fan -- to move air through the air chamber:

> Preferably, fan(s) 1502 take in air, which is released out through vents 1503. In such an arrangement, fan(s) 1502 act as an air intake and vents 1503 acts as an exhaust. A person of skill in the art would recognize that it is also possible for fan(s) 1502 and/or 1503 to be configured to act as an exhaust, rather than an intake.

(Ex. A, '141 Patent col. 13:5-10). "What is important is the fan 30 causes air to flow in the vicinity of the LED light." (Ex. E, '336 Patent, col. 5:48-50). The specification consistently treats the "fan portion" as a region in the structure of the housing, baffle or plate, nothing more. (Ex. A, '141 Patent, col. 6:33-35; Ex. B, '026 Patent, col. 6:8-10; Ex. D, '223 Patent, col. 6:36-38; Ex. E, '336 Patent, col. 6 :10-12; Ex. F, '573 Patent, col. 7:36-37). The intrinsic record does not limit the term "portion" to a passage extending through and defined by the lower baffle, faceplate, or housing and absolutely does not require the "portion to be configured to receive a fan."

The reasons for allowance of the GFY Patents provides further support for adopting the plain and ordinary meaning. In allowing the claims of the '141 Patent, the USPTO explained that claim 11 defines "a fan positioned in the fan portion of the lower baffle, wherein said fan directs air between the air chamber and the vent portion…" (Ex. I, NOA, '141 Patent; see also Ex. H, NOA, '026 Patent, Ex. J, NOA, '573 Patent (providing no limitation to the position of the fan)). The USPTO did not place any emphasis on the position of the fan in allowing the claims and certainly did not limit the fan portion to a passage extending through and defined by the lower baffle, faceplate, or housing. There was no specific disavowal of the fan position requiring a

passage that extends through and be defined by the lower baffle, faceplate, or housing, and no requirement that a passage be configured to receive a fan.

The purpose of the fans is to direct air over the UV light. Importing unclaimed structure and location to the claim would contravene the basic principle of claim construction. *Dayco Prods. v. Total Containment, Inc.*, 258 F.3d 1317, 1320-21, 1327 (Fed. Cir. 2001)("although we construe claims in light of the teaching of the specification, we do not treat characteristics of a preferred embodiment as claim limitations."). When the disputed language is comprised of commonly used words with no special meaning in the art, as is the case here, ***courts should leave it to its plain and ordinary meaning and decline further construction***. *Summit 6, LLC v. Samsung Elecs*. Co., 802 F.3d 1283, 1291 (Fed. Cir. 2015); *Liebel-Flarsheim Co. v. Medrad, Inc*., 358 F.3d 898, 906, 913 (Fed. Cir. 2004) (instructing courts to avoid narrowing claims to preferred structure disclosed in the specification.).

Further, Defendant improperly attempts to alter the preposition "in" to "within." (Ex. C, p. 5). Courts should not rewrite the language of the claims to narrow their scope; ***the claim language as written should control***. *Thorner,* 669 F.3d at 1362, 1366-68 (emphasis added) (Reversing the district court for improperly narrowing the claim term "attached to" by construing it to mean "attached to the external surface."). The natural reading of "in the fan portion" encompasses a fan located in a region of the lower baffle, faceplate, or housing: the plain and ordinary meaning of the terms.

Where the language is ordinary and unambiguous, such as here, no further construction is necessary. Defendant's attempt to redefine the claimed structure, features, and location violates the Federal Circuit standards for the construction of claim terms.

**B. "a UV-shield adapted to block UV light generated by the UV light source from exiting the first airway" / "a UV light shield attached to the first airway to block UV light from exiting the airway" / "a UV light screen positioned in the air chamber shielding the UV rays emitted from the UV light source from exiting the air chamber" / "a light protection plate positioned in proximity to an exit of the kill chamber at the vent to prohibit the UV light emitted from the UV-C light source from exiting the kill chamber"**

The terms "UV-Shield," "UV light shield," UV light screen," and "light protection plate" do not require specific construction and should be given the plain and ordinary meaning. The claim term "shield," appears in claims 1 and of the '026 Patent, claim 1 of the '336 Patent; the term "screen" appears in claim 7 of the '026 Patent and claim 10 of the '336 Patent; and the "protection plate" appears in claim 13 of the '573 Patent. (Ex. C pp. 5-6; Exs. B, E, F). Defendant seeks a construction that would include the improper structural and positional limitations of "a protruding barrier at the exit" or "a protruding barrier positioned in proximity to the exit."

| | | | |
|---|---|---|---|
| 7 | "a UV-shield adapted to block UV light generated by the UV light source from exiting the first airway"<br>'026 Patent, claim 1 (and all dependents thereof)<br>'336 Patent, claim 1 (and all dependents thereof) | "a protruding barrier at an exit of the first airway that is configured to block UV light generated by the UV light source from exiting the first airway" or indefinite | UV Partners reserves the right to rely on expert testimony, as well as any extrinsic evidence cited by GFY or to rebut any constructions GFY proposes. |
| 8 | "a UV light shield attached to the first airway to block UV light from exiting the airway" | "a protruding barrier at an exit of the first airway that is configured to block UV light from exiting the airway" or indefinite | UV Partners reserves the right to rely on expert testimony, as well as any extrinsic evidence cited by GFY or to rebut any constructions GFY proposes. |
| 9 | "a UV light screen positioned in the air chamber shielding the UV rays emitted from the UV light source from exiting the air chamber"<br>'026 Patent, claim 7 (and all dependents thereof)<br>'336 Patent, claim 10 (and all dependents thereof) | "a protruding barrier at an exit of the air chamber that is configured to block UV light emitted from the UV light source from exiting the air chamber" or indefinite | UV Partners reserves the right to rely on expert testimony, as well as any extrinsic evidence cited by GFY or to rebut any constructions GFY proposes. |
| 10 | "a light protection plate positioned in proximity to an exit of the kill chamber at the vent to prohibit the UV light emitted from the UV-C light source from exiting the kill chamber"<br>'573 patent, claim 13 (and all dependents thereof) | "a protruding barrier positioned in proximity to an exit of the kill chamber at the vent that is configured to block UV light emitted from the UV-C light source from exiting the kill chamber" or indefinite | UV Partners reserves the right to rely on expert testimony, as well as any extrinsic evidence cited by GFY or to rebut any constructions GFY proposes. |

(Ex. C, UV Partners Proposed Claim Construction pp. 5-6).

There are no special structural limitations applicable to a "UV shield," "UV light screen," or "light protection plate." Yet, Defendant's proposed construction adds a specific structure limitation to the claimed shield or screen, namely "a protruding barrier." That construction is not proper and should be rejected. The claims do not require structural limitation to the recited claim language requiring "a protruding barrier." The claims recite a structure designed to shield UV rays from exiting airways and entering an environment such as a room or commercial space. Thee inventors provided no specific limitation requiring a "protruding barrier" to what they claimed as the invention, and the Court should not add any limitation.

The claims use plain and ordinary English to describe a structure that functions to prevent UV light from exiting the chamber while the air within the chamber is irradiated by UV light. (Ex. A, '141 Patent, col. 2:48-3:25 ; Ex. D '223 Patent, col. 2:51-3:15; Ex. F,'573 Patent col. 3:43-4:8, Ex. B, '026 Patent, col. 2:43-3:28; Ex. E, the '336, 2:45-3:23). The claims place no limitation as to the size, shape, or structure of the "UV-shield," "UV light shield," "UV light screen," and "light protection plate." The claims do not limit the "UV shield," "UV light screen" or "light protection plate" to a protruding barrier. If that were the case, the inventors would have used the term "protruding barrier" instead of "UV-shield," "UV light shield," "UV light screen" or "guide member." The claims simply identify what the "UV shield," "UV light screen," or "light protection" structures accomplish, blocking light:

- "UV-shield adapted to block UV light…from exiting the first airway" (Ex. B, '026 Patent claim 1).
- "UV light screen…shielding the UV rays…from exiting the air chamber" (Ex. E, '336 Patent claim 10).
- "light protection plate…at the vent to prohibit the UV light…from exiting the kill chamber") (Ex. F, '573 claim 13).

Each claim already states a feature, to block UV light from exiting the specified chamber, without denoting protrusion or an exit-only location.

There is no description of a specific structure limitation that the UV shield in the '336 and '026 Patents be a "protruding barrier." (Ex, E, '336 Patent, 13:47-50). In the continuation-in-part applications, the specification teaches an alternative "system of barriers" designed to maintain the UV light in the UV kill zone: "In the embodiment of FIGS. 20A and 20B, the baffles 2040, 2042 and 2044 located in airways 1630 and/or 1631 operate to (1) shield UV rays from exiting the airways and entering an environment (such as a room or commercial space)…" (Ex. A, '141 Patent col. 3:46-53, 15:57-62; 13:65-14:3). The structure of the "UV-shield," "UV light shield," "UV light screen," and "light protection plate" recited in the claims prevents UV light generated from the UV-light source from exiting the kill chamber. There was no limitation placed on the structure.

Defendant's proposed construction improperly replaces the straightforward language of the "UV-shield," "UV light shield," "UV light screen," and "light protection plate" with specific limiting language requiring the structure be a "protruding barrier" (Ex. C, pp. 5-6). Again, this is an improper attempt to read specific structures from a preferred embodiment into the claims. *Liebel-Flarsheim,* 358 F.3d at 898, 913 ("we reject the district court's conclusion that the term 'opening' should be defined as limited to an opening in a pressure jacket. The specification does not define 'opening' restrictively, nor is there anything in the specification that supports the district court's conclusion that the term is ambiguous."); *Laitram Corp. v. NEC Corp.,* 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("[A] court may not import limitations from the written description into the claims.").

The proposed limitation of the UV light shield and UV light screen set forth in items 8 and 9 in Defendant's proposed construction highlights the danger in requiring the shield structure to

be positioned at the "exit of the airway/chamber" in all the claims. (Ex. C, pp. 5-6). For example, the claims of the '026 and '336 Patents recite a "UV light shield attached to the first airway" which is contrary to positioning the shield at the exit of the airway. (Ex. B; Ex. E). With respect to the UV light screen in item 9 above, the proposed construction would limit the claim to a protruding barrier positioned at the exit rather than "positioned in the air chamber" as recited in the claims. Those proposed constructions are a blatant attempt to rewrite the claims language chosen by the inventors. It is improper not to import "at the exit" or "protruding" into the claims where the patentees did not define the invention in the claims as including the limitation. *GE Lighting Sols., LLC v. AgiLight, Inc.,* 750 F.3d 1304, 1309-10 (Fed. Cir. 2014) (holding that the district court erred by reading structural features from the preferred embodiment into the meaning of dispute term.).

**C. "housing" / "a baffle, mounted to the housing" / "a baffle"**

The terms "housing," "a baffle, mounted to the housing" and "a baffle" as recited in claims 1 and 7 of the '026 and claims 1, 10 and 14 of the '336 Patents do not require specific construction and should be construed to have the plain and ordinary meaning. (See Ex. C pp. 7-8). Defendant's proposed construction that would include the improper structural and positional limitations should be rejected.

The term "housing," as used in the '026 and '336 patents should be given its plain and ordinary meaning because the intrinsic record provides sufficient guidance without any need for additional Court intervention. The recited term "housing" is used consistent with regular industrial sense. In the '336 Patent, claim 1 recites "a housing configured to be joined to a structure of a building," and claim 10 recites a "housing configured to fit into the structure of a building." (Ex. E). In the '026 Patent, claim 1 recites "a housing configured in the shape of a housing ceiling tile,"

and claim 7 recites "a housing configured to fit within a ceiling tile grid." (Ex. B; '026 Patent). The remaining portion of the claims further define the housing:

- an air chamber positioned in the housing,
- an air inlet in the housing
- a fan mounted in the housing
- a first vent in the housing

(Ex. E, '336 Patent, Ex. B, '026 Patent). The housing refers to a structure that includes specific components identified in the claims. The term "housing" is sufficiently clear that no further explanation is necessary.

Defendant's proposed construction, adding the phrase "an enclosure housing the components of the air-circulation device," does not clarify anything; it merely restates what the claims already identify while improperly narrowing the term by implying a specific arrangement of internal components. (Ex. C, p. 7). Here, the GFY Patents uniformly use the term "housing" to describe the outer structure containing components such as baffles, fans, UV-C emitters, filters, ducts, vents, and air chambers. None of the intrinsic evidence suggests that "housing" is limited to any construction, method, geometry, tile-shape, or internal arrangement. Adopting the narrow proposal would contravene the settled rule that courts begin with ordinary meaning read in context and many not import limitations from preferred embodiments. *ActiveVideo,* 694 F.3d at 1312, 1320-22.

Defendant's proposed construction of the claim terms "a baffle mounted to the housing, and defining a first airway between the fan and first vent" to mean "a baffle ***within*** the housing" only highlights why the plain and ordinary meaning of the term housing is the proper construction. (Ex. B, '026 Patent claim 1; Ex. E, '336 Patent, claim 1). It would be inconsistent to construe "a baffle mounted to the housing" to mean "a baffle ***within*** the housing." There is no need for a special definition that contradicts the plain meaning of the phrase "a baffle mounted to the housing

and defining a first airway between the fan and first vent." The baffle forms an airway where the UV light is mounted. The terms "housing" and "baffle" are basic industry terms. The claims expressly state that the baffle is "mounted to the housing" and "defines at least a first airway." (Ex. E, '336 Patent, col. 14:14-24).

The specification mirrors the ordinary usage, in that, the housing encloses the device, and the baffle shapes airflow and blocks UV light. (Ex. A, '141 Patent, col. 2:39-42; 2:48-64). The claims provide both the structural relationship and functional roles. The baffle is mounted to the housing and defines the airway; that is a clear structural relationship. (Ex. A, '141 Patent, 14:12-21). While the housing encloses and supports the structure, the baffle separates and directs airflow in the housing. (Ex. D, '223 Patent, col. 16:66-17:15). The specifications provide concrete examples of each. (Ex. E, '336 Patent, col. 9:16-29; Ex. D, '223 Patent, col. 11:4-25). Nothing in the claims or the specification narrow "housing" by adding design specifics, dimensions, sub-assemblies, or operational details. *Phillps* at 1323.

The Court should reject Defendant's attempt to manufacture ambiguity in common technical words.

**D. "lower baffle configured the size of a ceiling tile" / "face-plate configured the size of a ceiling tile" / "housing configured in the shape of a housing ceiling tile"**

The claims' language that the devices are "configured the size of a ceiling tile" or "configured in the shape of a housing ceiling tile" broadly describe the integration of the device's installation into a standard ceiling grid. (Ex. A, '141 Patent, col. 3:57-61):

| | | |
|---|---|---|
| 13 | "lower baffle configured the size of a ceiling tile"<br>'141 Patent, claim 11 (and all dependents thereof) | "lower baffle configured to correspond to a standard ceiling tile dimension" |
| 14 | "housing configured in the shape of a housing ceiling tile"<br>'026 Patent, claim 1 (and all dependents thereof) | "housing configured in the general shape of a standard ceiling tile" |
| 15 | "face-plate configured the size of a ceiling tile"<br>'223 Patent, claim 14 (and all dependents thereof) | "face-plate configured to correspond to a standard ceiling tile dimension" |

(see items 13, 14 and 15 in Ex. C).

The GFY Patents do not require special measurement parameters. The claims of the GFY Patents simply indicate ceiling-tile compatibility: "size of a ceiling tile," and "shape of a housing ceiling tile." Defendant endeavors to add "standard" or "general" limitations that do not appear in the claims nor the specification. (Ex. C, p. 7). For example, the intrinsic record explains there is no "standard" or "general shape" to the ceiling tile: "It is contemplated that an exemplary ceiling tile 1501 may be sized as 1'x4'; 2'x2'; or 2'x4', ***although a person of skill in the art would understand that any appropriately sized ceiling tile may be used in accordance with the present inventions***." (Ex. A, '141 Patent, col. 12:28-34, Ex. B, '026 Patent, col. 12:7-11; Ex. D, '223 Patent, col. 12:34-37; Ex. E, '336 Patent, col. 12:10-14; Ex. F, '573 Patent, col. 21-25)) (emphasis added). There is no limitation to a "standard" or "general shape" to the ceiling tile. Just the opposite is true, as any appropriately sized ceiling tile may be used in accordance with the present inventions. The ceiling-tile compatibility is in functional terms, allowing the device to be installed within a ceiling grid, not rigid geometric terms requiring strict conformity to a particular industry standard.

Courts must not import unrecited limitations into ordinary descriptive claim language when, as here, "the claim language contains no restrictions." *Malvern Panalytical Inc. v. TA*

*Instruments-Waters LLC,* 85 F.4th 1365, 1372-73 (Fed. Cir. 2023). Here, the claim language relating to the ceiling tile should not be changed.

## VI. "WHEREIN AIR FROM THE FAN ENTERS THE AIR CHAMBER AND PROCEEDS THROUGH THE VENT" / "WHEREIN AIR FROM THE FAN ENTERS THE AIR CHAMBER AND PROCEEDS THROUGH A VENT"

The airflow limitations "wherein air from the fan enters the air chamber and proceeds through the vent" describe a straightforward series of events that a person can easily understand: air moves into the chamber and then out through the vent. UV Partner's attempt to add "then" or otherwise rewrite the language does not clarify anything, it merely narrows the claims. The '336 and '026 Patents state: "air from the fan enters the air chamber and proceeds through the vent…" (Ex. B,'026 Patent, col. 14:43-44; Ex. E, '336 Patent, col. 14:51-52). The specifications similarly describe an airflow path in which the fan directs air into an interior chamber and through an outlet vent, without indicating a required sequence. (Ex. B,'026 Patent, col. 6:46-58; Ex. E, '336 Patent, col. 7:7-19). The direction of the airflow is irrelevant. (Ex. B, '026 Patent, col. 5:45-48, 8:61-62; Ex. D, '223 Patent, col. 9:20-21; Ex. E, '336, col. 8:63-64; Ex. F, '573 Patent, col. 10:23-24). Thus, the Court should not limit the claims to unrecited restrictions. *Thorner,* 669 F.3d at 1368.

## VII. CONCLUSION

For the foregoing reasons, the Court should reject Defendant's attempts to rewrite and narrow the asserted claims of the GFY Patents. The proposed constructions of Defendant improperly add limitations to the claims. GFY's constructions follow the claim language and established claim-construction principles. Therefore, GFY respectfully requests that the Court adopt the plain-and-ordinary meaning construction for the disputed terms.

Dated: March 31, 2026

Respectfully submitted,

*/s/ Patrick F. Solon*

Patrick F. Solon (Ill. Bar No. 6205890)
*Attorney in Charge*
Nicholas D. Niro (Ill. Bar No. 6345897)
Vitale, Vickrey, Niro, Solon & Gasey LLP
311 S. Wacker Drive, Suite 2200
Chicago, IL 60606
(312) 236-0733
(312) 236-3137 Facsimile
solon@vvnlaw.com
nniro@vvnlaw.com

Adam J. Brody (P62035)
Staci Rachelle DeRegnaucourt
Jeffrey Thomas Hewlett
VARNUM LLP
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
ajbrody@varnumlaw.com
srderegnaucourt@varnumlaw.com
jthewlett@varnumlaw.com

***Attorneys for Plaintiff Go Fan Yourself, LLC***

**CERTIFICATE OF COMPLIANCE**

Pursuant to the Court's First Case Management Order (Dkt. 15) and LCivR 7.2(b)(ii), the undersigned hereby certify that this document was prepared using Microsoft word, and that the word count for this document as provided by that software is 6,680, which is less than the 10,800-word limit for a brief as set forth in the Court's First Case Management Order.

Dated: March 31, 2026

Respectfully submitted,

*<u>/s/ Patrick F. Solon</u>*

Patrick F. Solon (Ill. Bar No. 6205890)
*Attorney in Charge*
Nicholas D. Niro (Ill. Bar No. 6345897)
Vitale, Vickrey, Niro, Solon & Gasey LLP
311 S. Wacker Drive, Suite 2200
Chicago, IL 60606
(312) 236-0733
(312) 236-3137 Facsimile
solon@vvnlaw.com
nniro@vvnlaw.com

Adam J. Brody (P62035)
Staci Rachelle DeRegnaucourt
Jeffrey Thomas Hewlett
VARNUM LLP
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
ajbrody@varnumlaw.com
srderegnaucourt@varnumlaw.com
jthewlett@varnumlaw.com

***Attorneys for Plaintiff Go Fan Yourself, LLC***