# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

GO FAN YOURSELF, LLC,

        Plaintiff,

        v.

UV PARTNERS, INC. d/b/a UV ANGEL,

        Defendant.

Hon. Robert J. Jonker

Case No. 1:25-cv-00644

**DEFENDANT UV PARTNERS' OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

CASE BACKGROUND ......................................................................................................... 2

    A.   OVERVIEW OF THE ASSERTED PATENTS.......................................................... 2

    B.   EVOLUTION OF THE ASSERTED PATENT FAMILY ............................................ 3

LEGAL STANDARDS .......................................................................................................... 5

DISPUTED TERMS............................................................................................................... 6

    A.   "fan portion" / "a fan positioned in the fan portion" ........................................................ 6

    B.   "a UV-shield adapted to block UV light generated by the UV light source from exiting the first airway" / "a UV light shield attached to the first airway to block UV light from exiting the airway" / "a UV light screen positioned in the air chamber shielding the UV rays emitted from the UV light source from exiting the air chamber" / "a light protection plate positioned in proximity to an exit of the kill chamber at the vent to prohibit the UV light emitted from the UV-C light source from exiting the kill chamber"................................... 15

    C.   "housing" / "a baffle, mounted to the housing" / "a baffle" ........................................ 21

    D.   "lower baffle configured the size of a ceiling tile" / "face-plate configured the size of a ceiling tile" / "housing configured in the shape of a housing ceiling tile" ........................... 28

    E.   "wherein air from the fan enters the air chamber and proceeds through the vent" / "wherein air from the fan enters the air chamber and proceeds through a vent".................. 32

CONCLUSION...................................................................................................................... 35

CERTIFICATE OF COMPLIANCE ....................................................................................... 35

## TABLE OF AUTHORITIES

**Federal Cases**                                                                              **Page(s)**

*Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*,
   808 F.3d 1313 (Fed. Cir. 2015)......................................................................................24

*AFG Indus., Inc. v. Cardinal IG Co.*,
   239 F.3d 1239 (Fed. Cir. 2001).....................................................................................10

*Aortic Innovations LLC v. Edwards Lifesciences Corp.*,
   159 F.4th 1 (Fed. Cir. 2025) ........................................................................................24

*Baran v. Med. Device Techs., Inc.*,
   616 F.3d 1309 (Fed. Cir. 2010).....................................................................................39

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
   713 F.3d 1090 (Fed. Cir. 2013).......................................................................................9

*CVI/Beta Ventures, Inc. v. Tura LP*,
   112 F.3d 1146 (Fed. Cir. 1997).....................................................................................24

*Edwards Lifesciences LLC v. Cook Inc.*,
   582 F.3d 1322 (Fed. Cir. 2009)...............................................................................23, 30

*Eon Corp. IP Holdings v. Silver Spring Networks*,
   815 F.3d 1314 (Fed. Cir. 2016).....................................................................................10

*Genentech, Inc. v. Wellcome Found. Ltd.*,
   29 F.3d 1555 (Fed. Cir. 1994).................................................................................13, 21

*Goldenberg v. Cytogen, Inc.*,
   373 F.3d 1158 (Fed. Cir. 2004).....................................................................................12

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
   558 F.3d 1368 (Fed. Cir. 2009).................................................................................14, 24

*Indacon, Inc. v. Facebook, Inc.*,
   824 F.3d 1352 (Fed. Cir. 2016).....................................................................................12

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*,
   933 F.3d 1345 (Fed. Cir. 2019)...............................................................................9, 12, 13

*Malvern Panalytical Inc. v. TA Instruments-Waters LLC*,
   85 F.4th 1365 (Fed. Cir. 2023) .....................................................................................12

*Masimo Corp. v. Sotera Wireless, Inc.*,
No. 2022-1393, 2023 WL 6990542 (Fed. Cir. Oct. 24, 2023)..................................................13

*O2 Micro International, Ltd. v. Beyond Innovation Technology Co.*,
521 F.3d 1351 (Fed. Cir. 2008)..................................................................................................10

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc).............................................................................9, 10

*Rembrandt Patent Innovations, LLC v. Apple, Inc.*,
716 F. App'x 965 (Fed. Cir. 2017) ..............................................................................................9

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.*,
222 F.3d 958 (Fed. Cir. 2000)..............................................................................................24, 30

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
529 F.3d 1364 (Fed. Cir. 2008)..................................................................................................38

*Vehicle IP, LLC v. Cellco P'ship*,
757 F. App'x 954 (Fed. Cir. 2019) ............................................................................................12

*Virnetx, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)..................................................................................................14

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017)..................................................................................................24

## INTRODUCTION

The parties dispute the construction of 14 terms, comprised of five term groupings given the substantial similarity of a number of these terms, across the five asserted patents in this case. These claim construction disputes stem from the same underlying issue—the applicant's pivot during prosecution to inject UV treatment technology into the asserted claims using claim language that is untethered to the specification and lacks objective boundaries.

Much, if not all, of this claim scope ambiguity is likely by design. The Asserted Patent family includes over 20 patent applications, plagued with terminal disclaimers to overcome double patenting rejections. Four of the five Asserted Patents are subject to terminal disclaimers. This pattern reflects a consistent approach to prosecution—repackaging the same invention in numerous but purportedly slightly different ways across multiple patents, resulting in overlapping and ambiguous claim scope.

Consistent with that approach, the Asserted Patents frequently: (1) use different terms interchangeably to refer to the same structure, without explaining any meaningful difference between them; (2) introduce terms for the first time in the claims, including coined terms with no established meaning in the art and never used in the specification; (3) define limitations in purely functional terms without identifying the structure that performs the function, and (4) rely on imprecise language that obscures the scope and boundaries of the claimed invention.

Plaintiff's reliance on "plain and ordinary meaning" for all disputed terms fails to resolve these fundamental issues, leaving UV Partners, experts, and ultimately the jury to divine interpretations untethered from the intrinsic record if not construed. Construction is needed to proscribe the scope of these terms and ensure that the claims are construed consistent with the intrinsic evidence.

1

## CASE BACKGROUND

Plaintiff asserts five patents in this case: United States Patent Nos. 10,316,141 (the "'141 Patent") (Ex. A); 10,670,026 (the "'026 Patent") (Ex. B); 11,028,223 (the "'223 Patent") (Ex. C); 11,255,336 (the "'336 Patent") (Ex. D); and 11,332,573 (the "'573 Patent") (Ex. E) (collectively, the "Asserted Patents").

### A.    OVERVIEW OF THE ASSERTED PATENTS

"The present inventions relate to ceiling tiles with built in air flow mechanisms and . . . a UV light source which decontaminates air as it flows through the ceiling tiles and thus helps prevent the spread of bacteria, fungus, viruses and/or mold, etc." Ex. A ('141 Patent), 1:16-22. The Asserted Patents describe four sets of embodiments. Figures 1-14 depict a "combination light and fan fixture." *Id.*, 4:56-5:27, 6:33-34, 7:4-5, 8:24-31, 8:36-49, 9:19-23, 12:19-20, 12:26-27; *see also id.*, 5:53-12:27. These figures and accompanying specification, which form the backbone of the patent family, do not teach or otherwise disclose any UV light source or disinfection. As detailed below, those teachings were only added later. Specifically, Figures 15-17 and the accompanying specification disclose a "ceiling tile" having "one or more fans [] and vents [] cut into the ceiling tile" and for the first time "a UV light source for irradiating air flow through an airway" mounted to the ceiling tile. *Id.*, 5:28-36, 12:39-41; *see also id.*, 12:28-14:15. Figures 18-20 depict another version of a "ceiling tile," but that is defined by an "upper baffle" and "lower baffle," that includes an airway that is internal to the ceiling tile, with the fan positioned in the lower baffle,  and that includes "a series of baffles . . . to direct the air flowing through the airways . . . [and] through an outlet vent." *Id.*, 5:37-48, 14:44-15:1; *see also id.*, 14:16-16:1. Finally, Figure 21 depicts a "recessed light fixture" that "defines a[n] interior tunnel or kill chamber" and "includes a fan . . . to move air along a first airway." Ex. E ('573 Patent), 6:25-27, 17:47-52; *see also id.*, 17:47-19:22.

2

### B.    EVOLUTION OF THE ASSERTED PATENT FAMILY

The Asserted Patents share the same patent family, which totals over 20 total patent applications. Many are continuation-in-part ("CIP") applications, and many are subject to terminal disclaimers. An illustration of the Asserted Patent family is included below to show the evolution of the Asserted Patents and their associated figures. Figures from certain applications are identified in red to emphasize where particular figures were introduced. The Asserted Patents are highlighted in yellow.



Asserted Patent Family Tree.

As depicted, all Asserted Patents claim priority to the following three patent applications: (1) Provisional Appl. No. 62/439,719, (2) Appl. No. 15/471,762 (now U.S. Patent No. 10,006,619) (the "'619 Patent") (Ex. F), and (3) Appl. No. 15/589,367 (now U.S. Patent No. 10,247,191) (the "'191 Patent") (Ex. G). The two non-provisional applications added new figures and their associated disclosure, and formalized Figures 1-14, also present in the Asserted Patents. These applications disclose a "combined LED light and fan apparatus" that can be built into the footprint

3

of an office ceiling tile. Ex. G ('191 Patent), title, Abstract, 1:11-13. Notably, these applications include no reference to UV disinfection, UV lighting, or killing pathogens—critical components of the Asserted Patent claims. Instead, these applications are targeted at integrating a fan into an LED lighting system, where the fan can be configured to direct cool air across the LED lights to dissipate heat from the LED lights and to direct the resulting warmer air out of the LED lighting system. *Id.*, 1:11-16, 1:35-36, 2:45-53, 3:7-9, 6:63-7:3, 7:66-8:7, claims 1, 6, 8. This combined apparatus sought to provide supplemental air circulation for HVAC systems, more efficient heating of indoor spaces, and thermal management for LEDs. *Id.*, 1:31-36, 1:48-2:26, 3:7-9.

Application No. 16/040,189 (now U.S. Patent No. 10,221,857) (the "'857 Patent") (Ex. H), filed July 2018, is the earliest disclosure in the Asserted Patent family pertaining to UV disinfection, UV lighting, or killing pathogens. This application added Figures 15-17 and their associated disclosure, present in all the Asserted Patents. These "[e]mbodiments of the inventions further include a UV light source which decontaminates air as it flows through ceiling tiles and thus helps prevent the spread of viruses and/or mold, etc." Ex. H ('857 Patent), 1:15-19. Figures 15-17 depict a ceiling tile 1501 and various cut-in or mounted components that define airways where UV light kills pathogens. *Id.*, 12:1-13:55.

From the '857 Patent, the Asserted Patent family breaks into several branches, two of which are relevant to the Asserted Patents. A first branch includes the Asserted '026 Patent and '336 Patent, which are continuation applications stemming from the '857 Patent. Notably, like the '857 Patent, the Asserted '026 Patent and '336 Patent only include Figures 1-17.

A second branch includes the Asserted '141 Patent, the '223 Patent, and the '573 Patent. The '141 Patent application is a continuation-in-part of the '857 Patent application and adds Figures 18-20B and associated disclosure. Both the Asserted '141 Patent and the Asserted '223

Patent only include Figures 1-20B. The '573 Patent application is a continuation-in-part of the '223 Patent application that adds Figure 21 and its associated disclosure.

In short, many of the Asserted Patents include different figures and associated disclosures, introduced at different stages and in different branches of the prosecution history. These variations do not redefine the meaning of terms that were already introduced and consistently used in the original disclosure. Rather, they underscore the need for construction grounded in the intrinsic record of each patent, ensuring that claim terms are interpreted consistently with how they are actually described and used in the specification.

**LEGAL STANDARDS**

The claims "define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). "Claim construction seeks to ascribe the meaning to a claim term as understood by a person of ordinary skill in the art at the time of the invention." *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1350 (Fed. Cir. 2019). "The meaning of a term must be considered in the context of all the intrinsic evidence, including the claims, specification, and prosecution history." *Id.* (quoting *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1094 (Fed. Cir. 2013)) (internal quotation marks omitted). Courts "begin with the language of the claims." *Id.* Courts then move to the specification and prosecution history. *Id.* The specification of the patents-in-suit is "always highly relevant." *Phillips,* 415 F.3d at 1315.

Extrinsic evidence, such as expert testimony, may be useful to the court to "provide background" on the relevant technology, or to explain the technical understanding of a person of ordinary skill in the art. *Id.* However, extrinsic evidence may not contradict the intrinsic record. *Rembrandt Patent Innovations, LLC v. Apple, Inc.,* 716 F. App'x 965, 971 (Fed. Cir. 2017)

5

(disregarding expert testimony that conflicted with the specification). Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Phillips*, 415 F.3d at 1318.

"[W]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) (quoting *O2 Micro International, Ltd. v. Beyond Innovation Technology Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008)) (internal quotation marks omitted). "It is critical for trial courts to set forth an express construction of the material claim terms in dispute, in part because the claim construction becomes the basis of the jury instructions, should the case go to trial." *AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001). "[A] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Eon*, 815 F.3d at 1318 (quoting *O2 Micro*, 521 F.3d at 1361); *see also id.* at 1319 ("By determining only that the terms should be given their plain and ordinary meaning, the court left this question of claim scope unanswered, leaving it for the jury to decide. This was legal error.").

## DISPUTED TERMS

### A.     "fan portion" / "a fan positioned in the fan portion"

| "fan portion" | |
| --- | --- |
| **UV Partners' Construction** | **GFY's Construction** |
| "a passage extending through and defined by the lower baffle, the passage being configured to receive a fan within the passage"<br><br>'141 Patent, claim 11 (and all dependents thereof) | Plain-and-ordinary meaning |

| | |
|---|---|
| "a passage extending through and defined by the ceiling tile, the passage being configured to receive a fan within the passage"<br><br>'223 Patent, claim 1 (and all dependents thereof) | Plain-and-ordinary meaning |
| "a passage extending through and defined by the face- plate, the passage being configured to receive a fan within the passage"<br><br>'223 Patent, claim 14 (and all dependents thereof) | Plain-and-ordinary meaning |
| "a passage extending through and defined by the panel, the passage being configured to receive a fan within the passage"<br><br>'573 Patent, claim 1 (and all dependents thereof) | Plain-and-ordinary meaning |
| "a passage extending through and defined by the recessed fixture, the passage being configured to receive a fan within the passage"<br><br>'573 Patent, claim 13 (and all dependents thereof) | Plain-and-ordinary meaning |

| "a fan positioned in the fan portion" | |
|---|---|
| **UV Partners' Construction** | **GFY's Construction** |
| "a fan positioned within the fan portion"<br><br>'141 Patent, claim 11 (and all dependents thereof)<br>'223 Patent, claim 1 (and all dependents thereof)<br>'223 Patent, claim 14 (and all dependents thereof)<br>'573 Patent, claim 1 (and all dependents thereof)<br>'573 Patent, claim 13 (and all dependents thereof) | Plain-and-ordinary meaning |

This dispute centers on the meaning of the coined term "fan portion"—a term without an established meaning in the art and not once used in the specification of any of the Asserted Patents,

7

nor explicitly identified in the figures—and whether a construction is necessary to resolve its scope. Defendant's proposed construction provides objective boundaries for this term, consistent with the intrinsic evidence. Plaintiff's plain-and-ordinary proposed construction leaves this term without clear boundaries such that its claim scope is not reasonably certain.

The Federal Circuit has explained that when a "coined term" is claimed, it raises the question of "whether the intrinsic evidence provides objective boundaries to the scope of the term." *Iridescent Networks*, 933 F.3d at 1353. In cases where "the term lacks a plain or established meaning in the relevant art . . . the court should not construe [the disputed term] more broadly than the specification's disclosure." *Vehicle IP, LLC v. Cellco P'ship*, 757 F. App'x 954, 958 (Fed. Cir. 2019) (citing *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016)); *see also Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004) (where the disputed term "has no accepted meaning to one of ordinary skill in the art . . . we construe it only as broadly as is provided for by the patent itself."). When determining whether a term has a plain and ordinary meaning, courts focus on "the question of what plain and ordinary meaning a term has in the context of a patent." *Malvern Panalytical Inc. v. TA Instruments-Waters LLC*, 85 F.4th 1365, 1374 (Fed. Cir. 2023).

Here, the term "fan portion" does not appear in the specification of any of the Asserted Patents, with the term only appearing in the claims. Construction is needed to resolve its scope. The term "fan portion" as used in the claims defines a portion of a claimed structural member (i.e., the claimed lower baffle, ceiling tile, panel, face-plate, or recessed fixture) in which a fan is positioned. However, the asserted claims fail to provide any objective boundaries or structural features defining what constitutes a "fan portion" and what it means for a fan to be "positioned in the fan portion," which is especially problematic given the claimed structural members do not

8

inherently have any passage, cavity, or recess in which a fan could even be positioned. Without structural boundaries, a person of ordinary skill in the art would be left to guess where the boundaries of a "fan portion" are and what physical relationship between the fan and structural member is required to infringe the asserted claims. A person of ordinary skill in the art would also be left to guess how a "fan portion" differs among the various claimed structural members, including a lower baffle, ceiling tile, panel, face-plate, and recessed fixture. This ambiguity invites legally incorrect reads of the claims that are untethered to the intrinsic evidence, including interpretations in which a fan need not be physically positioned within any defined portion of the claimed structural member, an argument Defendant expects Plaintiff to make.

This ambiguity in the asserted claims is compounded by the fact that the term "fan portion" does not appear anywhere in the specification of any of the Asserted Patents. Where, as here, "the claim language is not sufficiently clear on its face to provide guidance to a person of ordinary skill in the art as to the meaning of the term," courts look next "to the specification . . . to determine the meaning of the term." *Iridescent Networks*, 933 F.3d at 1351; *see also Genentech, Inc. v. Wellcome Found. Ltd.*, 29 F.3d 1555, 1563 (Fed. Cir. 1994) ("Since a definition of [the disputed term] cannot be extracted from the claims themselves, we look to the specification for guidance.").

Here, the specifications of the Asserted Patents do not define, label, or even reference the term "fan portion." Instead, the only guidance provided by the intrinsic record can be inferred from the disclosed embodiments and figures of the Asserted Patents, which consistently describe the fan positioned within a passage extending through and defined by a structural member. Courts find consistent characterizations, descriptions, or depictions of a claim term as informative for claim construction. *See, e.g.*, *Masimo Corp. v. Sotera Wireless, Inc.*, No. 2022-1393, 2023 WL 6990542, at *4 (Fed. Cir. Oct. 24, 2023) (where "the claim language itself is not particularly informative" as

to the meaning of a term but the "specification is uniform in its description" of the term, the "uniformity of description" governs the construction); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374-76 (Fed. Cir. 2009) (the court construing the term "spike"—a component of a valve—to be "pointed" because "the specification repeatedly and uniformly describes the spike as [] pointed" and "never suggests that the spike can be anything other than pointed," finding it informative that "each figure depicts the spike as . . . pointed") (internal quotation marks omitted); *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1318-19 (Fed. Cir. 2014) ("The fact that anonymity is repeatedly and consistently used to characterize the invention strongly suggests that it should be read as part of the claim" in the court's construction of the disputed term) (internal quotation marks omitted).

Defendant's construction can be inferred from the specification's consistent description of the structural members and how a fan fits in a portion of that structural member. For example, the embodiments shown in Figures 15-17 depict passages (highlighted below) extending through and defined by a ceiling tile/panel 1501, within which fans 1502 are positioned. *See, e.g.,* Ex. C ('223 Patent), Figs. 15-17, 12:31-33, 12:42-45 ("*[C]eiling tile 1501 may have one or more fans 1502* and vents 1503 *cut into the ceiling tile 1501*, sometimes referred to herein as a ceiling panel.") (emphasis added), 14:14-17 ("FIG. 17 shows an exploded view of components of the invention. For example, the embodiment of FIG. 17 shows *a ceiling tile 1501 in which there are cut-outs for fans 1502* and vents 1503.") (emphasis added). A person of ordinary skill in the art would understand each passage to be a "fan portion," and a respective "fan [to be] positioned within the fan portion," consistent with Defendant's constructions.



*Id.*, Figs. 16B, 17 (annotated in yellow); *see also* Ex. A ('141 Patent), Figs. 15-17 (and corresponding description); Ex. E ('573 Patent), Figs. 15-17 (and corresponding description).

As another example, the embodiments shown in Figures 18-20B depict passages (highlighted below) extending through and defined by a lower baffle 2020/2021 of a ceiling tile/panel 1801,[1] within which fans 2002 are received and positioned. *See, e.g.*, Ex. C ('223 Patent), Figs. 18-20B, 14:49-55, 14:21-37 ("Various aspects of this disclosure may include components which are implemented directly into the ceiling grid, or ceiling tile 1801, as seen for example *in FIG. 18* . . . In embodiments of the inventions, *ceiling tile 1801 may have one or more fans* . . . *cut into the ceiling tile 1801*, or positioned in the ceiling grid, sometimes referred to herein as a ceiling panel.") (emphasis added), 15:33-34 ("*[F]an(s) 2002 act as an air intake and vents 2003 act as an exhaust.*") (emphasis added). A person of ordinary skill in the art would

---

[1] A child application of the '223 Patent, '141 Patent, and '573 Patent—Appl. No. 17/739,337 (now U.S. Patent No. 11,608,411) (Ex. I)—amended Figures 18-20B to clarify that all these figures depict ceiling tile/panel 1801.

11

understand each passage to be a "fan portion," and a respective "fan [to be] positioned within the fan portion," consistent with Defendant's constructions.



*Id.*, Figs. 18, 20A (annotated in yellow); *see also* Ex. A ('141 Patent), Figs. 18-20B (and corresponding description); Ex. E ('573 Patent), Figs. 18-20B (and corresponding description).

As another example, the embodiment shown in Figure 21 depicts a passage that serves as the fan portion (highlighted below) defined by a lower baffle 3020 of a recessed fixture 3001, within which a fan 3002 is received and positioned. *See, e.g.*, Ex. E ('573 Patent), Fig. 21, 17:47-52, 17:57-59, 18:1-18, 18:47-50. A person of ordinary skill in the art would understand the passage to be a "fan portion," and the "fan [to be] positioned within the fan portion," consistent with Defendant's constructions. This embodiment reflects the same structural relationship shown in the earlier figures, in which the fan is received within a defined passage formed by the surrounding structure.



*Id.*, Fig. 21 (annotated in yellow).

While not teaching the UV disinfectant claimed invention, the embodiments shown in Figures 1-14 further support this construction. Specifically, Figures 1-14 depict a passage (examples highlighted below) extending through and defined by a lens 90, within which a fan 30 is positioned. *See* Ex. C ('223 Patent), Figs. 1-14; *see also* Ex. A ('141 Patent), Figs. 1-14; Ex. E ('573 Patent), Figs. 1-14; Ex. B ('026 Patent), Figs. 1-14; Ex. D ('336 Patent), Figs. 1-14. A person of ordinary skill in the art would understand each passage to also be a "fan portion," and the "fan [to be] positioned within the fan portion," consistent with Defendant's constructions.

13



Ex. C ('223 Patent), Figs. 2-3 (annotated in yellow); *see also id.*, Figs. 1, 4-6, 9-12.



*Id.*, Figs. 13-14 (annotated in yellow).

In short, the disclosed embodiments consistently anchor the fan's position to within a defined structural passage, which a person of ordinary skill in the art would understand to be the claimed "fan portion" of a structural member. Permitting the coined "fan portion" and "a fan positioned in the fan portion" to mean something broader than that would improperly expand the scope of these claims beyond what the intrinsic record supports, leaving these terms without objective boundaries. Accordingly, the Court should adopt Defendant's constructions.

14

        **B.**      **"a UV-shield adapted to block UV light generated by the UV light source from exiting the first airway" / "a UV light shield attached to the first airway to block UV light from exiting the airway" / "a UV light screen positioned in the air chamber shielding the UV rays emitted from the UV light source from exiting the air chamber" / "a light protection plate positioned in proximity to an exit of the kill chamber at the vent to prohibit the UV light emitted from the UV-C light source from exiting the kill chamber"**

| "a UV-shield adapted to block UV light generated by the UV light source from exiting the first airway" | |
| --- | --- |
| **UV Partners' Construction** | **GFY's Construction** |
| "a protruding barrier at an exit of the first airway that is configured to block UV light generated by the UV light source from exiting the first airway" or indefinite<br><br>'026 Patent, claim 1 (and all dependents thereof),<br>'336 Patent, claim 1 (and all dependents thereof) | Plain-and-ordinary meaning |

| "a UV light shield attached to the first airway to block UV light from exiting the airway" | |
| --- | --- |
| **UV Partners' Construction** | **GFY's Construction** |
| "a protruding barrier at an exit of the first airway that is configured to block UV light from exiting the airway" or indefinite<br><br>'336 Patent, claim 14 (and all dependents thereof) | Plain-and-ordinary meaning |

| "a UV light screen positioned in the air chamber shielding the UV rays emitted from the UV light source from exiting the air chamber" | |
| --- | --- |
| **UV Partners' Construction** | **GFY's Construction** |
| "a protruding barrier at an exit of the air chamber that is configured to block UV light emitted from the UV light source from exiting the air chamber" or indefinite | Plain-and-ordinary meaning |

| '026 Patent, claim 7 (and all dependents thereof); '336 Patent, claim 10 (and all dependents thereof) | |
| --- | --- |

| "a light protection plate positioned in proximity to an exit of the kill chamber at the vent to prohibit the UV light emitted from the UV-C light source from exiting the kill chamber" | |
| --- | --- |
| **UV Partners' Construction** | **GFY's Construction** |
| "a protruding barrier positioned in proximity to an exit of the kill chamber at the vent that is configured to block UV light emitted from the UV-C light source from exiting the kill chamber" or indefinite '573 Patent, claim 13 (and all dependents thereof) | Plain-and-ordinary meaning |

This dispute centers on the meaning of the terms "UV-shield," "UV light shield," "UV light screen," and "light protection plate." Each of these terms should be construed the same, given these terms are used interchangeably in the specification to describe a specific structure and configuration. Defendant's proposed constructions provide objective boundaries for these terms grounded in the intrinsic record and reflect that these terms represent the same structure. Plaintiff's plain-and-ordinary proposed constructions leave the scope of these terms inappropriately malleable, indefinite, and generally unclear.

Critically, the claims use the terms "UV-shield," "UV light shield," and "UV light screen" functionally—i.e., a UV-shield "adapted to block UV light," a UV light shield for "block[ing] UV light," and a UV light screen for "shielding the UV rays"—without reciting sufficient structural features, materials, configurations, or positional requirements that would inform a person of ordinary skill in the art as to the scope of these terms and how these functions are accomplished. As a result, under Plaintiff's plain-and-ordinary approach, any structure that reduces UV light

16

could be argued to satisfy these claim limitations—rendering this limitation as functionally no limit at all.

The term "light protection plate" fares no better, given the claims and specification provide no meaningful distinction between this term and the others but instead uses these terms interchangeably. Plaintiff's use of multiple interchangeable terms to describe the same structure "reflect[s] either inartful drafting, a conscious attempt to create ambiguity about the scope of the claims, or a desire to claim a wide variety of materials not described or enabled in the specification." *Genentech*, 29 F.3d at 1564.

The terms "UV-shield," "UV light shield," and "UV light screen" are only described in a single paragraph[2] in the specifications of the '026 Patent and '336 Patent—the only patents with asserted claims including these terms—reproduced below. These terms are used interchangeably with "flange 1650" to refer to structure 1650 (highlighted below) in Figure 16B.

> *Furthermore, some embodiments of the inventions may include **a <u>UV-screen</u> in the form of <u>flange 1650</u> which is attached to the end of airways 1630 and/or 1631 to <u>shield</u> UV rays from exiting the airways** and entering an environment (such as a room or commercial space). In this way, including **<u>UV-screen(s) 1650</u> at the end of an airway** Although FIG. 16B illustrates a UV source in an embodiment which is built into a ceiling tile, it should be understood that the disclosed UV source and "kill chamber" may be implemented in any of the embodiments disclosed herein."*

Ex. B ('026 Patent), 13:44-53 (emphasis added); *see also* Ex. D ('336 Patent), 13:47-56. As depicted below, structure 1650 is a protruding barrier at an exit of each airway 1630/1631 that is

---

[2] The term "UV-screen" is additionally used in two sentences in the "Summary of the Invention." *See* Ex. B ('026 Patent), 3:19-20, 3:27-28; Ex. D ('336 Patent), 3:21-22, 3:29-30. However, these sentences—like the asserted claims—use this term functionally and likewise fail to provide sufficient structural features, materials, configurations, or positional requirements that would inform a person of ordinary skill in the art as to the scope of this term and how its functions are accomplished.

configured to block UV light from exiting the airways 1630/1631, consistent with Defendant's constructions.



Figure 16B

Ex. B ('026 Patent), Fig. 16B (annotated in yellow); *see also* Ex. D ('336 Patent), Fig. 16B.

Likewise, the term "light protection plate" is only referenced in a single paragraph of the specification of the '573 Patent—the only Asserted Patent to use this term—part of which is reproduced below. This term is used interchangeably with "seal 3007," "baffles 3007," "screens 3007," and "shield" to refer to structure 3007 in added Figure 21 of the '573 Patent. *See*:

> *There is a **light protection plate 3007 which operates to** direct the UV-C light into the kill chamber and **prohibit the UV light emitted from the UV-C light system 3060 from exiting the kill chamber 3030**.*

Ex. E ('573 Patent), 18:22-25 (emphasis added); *see also*:

> *There is a **seal 3007** between the outside baffle 3010 and the ceiling 3004 to ensure that the air leaving the kill chamber 3030 through the vent 3003 does not escape from the air purification fixture 3001.*

*Id.*, 18:18-22 (emphasis added);

> *"The **baffles 3007** may be positioned on the opposite side of the airway 3030."*

18

*Id.*, 18:46-47 (emphasis added);

> *Furthermore, the **screens 3007** operate to (1) **shield UV** rays from exiting the airways and entering an environment (such as a room or commercial space) and (2) to increase the intensity the air is exposed to the UV-C light emitted by the UV-C light source 3060, and (3) increase the duration of air flowing through the airway 3030 is exposed to the UV-C light.*

*Id.*, 19:12-18 (emphasis added).

As depicted below, structure 3007 is a protruding barrier in proximity to an exit of the kill chamber that is configured to block UV light from exiting the kill chamber, consistent with Defendant's constructions.

**Fig. 21**

*Id.*, Fig. 21 (annotated in yellow).

Where, as here, multiple claim terms are used interchangeably to mean the same thing or refer to the same element, courts frequently construe these terms to mean the same thing. *See, e.g., Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329-30 (Fed. Cir. 2009) ("***The***

19

*interchangeable use of the two terms is akin to a definition equating the two* . . . Different terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper.") (emphasis added); *Aortic Innovations LLC v. Edwards Lifesciences Corp.*, 159 F.4th 1, 8 (Fed. Cir. 2025) ("A patent's consistent and clear interchangeable use of two terms can result in a definition equating the two terms."); *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 968 (Fed. Cir. 2000) ("[I]t is readily apparent that *the terms "body portion" and "layer" are used interchangeably in the specification, and therefore should be construed in the same manner*.") (emphasis added); *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1282 (Fed. Cir. 2017). Here, because the disputed terms are used interchangeably in the specifications of the Asserted Patents to refer to the same structure, they should all be construed similarly.

Further, Defendant's use of consistent representations in the figures to construe these terms is proper. *See, e.g.*, *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1317-18 (Fed. Cir. 2015) (affirming construction of the term "proximate end" to mean "the extreme or last part lengthwise" based on this depiction in "every figure" showing the disputed term); *ICU Med.*, 558 F.3d at 1374-76 (the court construing the term "spike"—a component of a valve—to be "pointed" in part because "each figure depicts the spike as . . . pointed"); *see also CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1153 (Fed. Cir. 1997) ("[P]atent drawings are highly relevant in construing the [] limitations of the claims.").

Here, because the disputed terms are interchangeably used to refer to the same element and are consistently described and depicted as a protruding barrier at or in proximity to an exit of the airway that is configured to block UV light from exiting the airway, the court should adopt Defendant's constructions consistent with the intrinsic record. In the alternative, if the court finds

these terms are not limited to the described and depicted embodiments, they should be found

indefinite for failing to provide objective boundaries.

**C.**    **"housing" / "a baffle, mounted to the housing" / "a baffle"**

| "housing" | |
| --- | --- |
| **UV Partners' Construction** | **GFY's Construction** |
| "an enclosure housing the components of the air circulation device"<br><br>'026 Patent, claims 1, 7 (and all dependents thereof)<br>'336 Patent, claims 1, 10, 14 (and all dependents thereof) | Plain-and-ordinary meaning |

| "a baffle, mounted to the housing" | |
| --- | --- |
| **UV Partners' Construction** | **GFY's Construction** |
| "a baffle, mounted within the housing"<br><br>'026 Patent, claim 1 (and all dependents thereof)<br>'336 Patent, claim 1 (and all dependents thereof) | Plain-and-ordinary meaning |

| "a baffle" | |
| --- | --- |
| **UV Partners' Construction** | **GFY's Construction** |
| "a baffle within the housing"<br><br>'336 Patent, claim 14 (and all dependents thereof) | Plain-and-ordinary meaning |

The intrinsic evidence repeatedly uses and depicts the term "housing" to mean an enclosure

housing the components (e.g., fan, baffle, defined airways/chambers, etc.) of the device, such that

the components are positioned within the housing. The Court should construe this term to prevent

21

Plaintiff from expanding "housing" to include any structural member, even ones that do not enclose anything, untethered from the intrinsic evidence. The court should, accordingly, also construe the claimed "baffle" to make clear that it is within the housing.

The intrinsic evidence supports Defendant's construction. The specification consistently describes and depicts a "housing" as an enclosure housing the components of the device. For example, Figures 5 and 6 depict a "housing 112" (highlighted below) that encloses and houses various internal components, including LED light fixtures 120, fan 130, internal baffles 114, and an air diverter 150 mounted to the housing 112. Ex. B ('026 Patent), 9:39-57.

**Fig. 5**



*Id.*, Fig. 5 (annotated in yellow); *see also id.*, Fig. 6; Ex. D ('336 Patent), Figs. 5-6.

As another example, Figure 7 depicts a "shell 292 [that] serves as a troffer or housing" (highlighted below). *See, e.g.*, Ex. E ('573 Patent), 12:49-50; Ex. B ('026 Patent), 11:16-19. As shown, the housing encloses and houses various internal components, including LED light fixtures 220, fan 230, and diverter 250. *See, e.g.*, Ex. B ('026 Patent), 11:1-25.

**Fig. 7**



*Id.*, Fig. 7 (annotated in yellow); *see also* Ex. D ('336 Patent), Fig. 7; Ex. E ('573 Patent), Fig. 7.

As another example, a related patent—U.S. Patent No. 11,608,411 (the "'411 Patent") (Ex. I)—depicts an "external housing 2202" (highlighted below) creating a "self-contained unit, such that the fan 1502, baffles 1620 and UV-C light source 1640 are all contained within an external housing 2202." Ex. I ('411 Patent), 19:57-60. This disclosure further reflects the patentee's consistent use of "housing" to mean an enclosure housing the components of the device.

23

**Fig. 22**



*Id.*, Fig. 22 (annotated in yellow).

As another example, Figures 1-2 depict a housing (highlighted below) that includes a "troffer shelf 12" and a "troffer baffle 14." Ex. B ('026 Patent), 5:29-34, 6:32-35. The patent uses the term "housing" to refer to the overall structure formed by components such as the "troffer shelf 12" and "troffer baffle 14." *E.g.*, compare *id.*, 7:44-47 ("As the flow of air from the fan 30 extends towards the exterior perimeter of ***the troffer shelf 12 and troffer baffles 14*** through the vent 84, the flow becomes more turbulent and mixes with the surrounding air.") (emphasis added) with 8:49-53 ("As the flow of air from the fan 30 extends towards the exterior perimeter of the ***housing*** in the vent 84, the flow becomes more turbulent and mixes with the surrounding air such that the air exiting through the damper 81 is more turbulent in nature.") (emphasis added). As shown, the housing encloses and houses various internal components, including LED light fixtures 20, fan 30, and an air diversion mechanism 50. *See, e.g.*, *id.*, 5:33-34, 6:46-58.

24



Fig. 2

*Id.*, Fig. 2 (annotated in yellow); *see also* Ex. D ('336 Patent), Fig. 2.

Other intrinsic evidence also supports Defendant's proposed constructions. For example, the specifications of the Asserted Patents clarify that the housing is a "container" (i.e., enclosure). *See, e.g.*, Ex. B ('026 Patent), Abstract ("The disclosed systems may include a ***housing container*** and an axial fan.") (emphasis added). Further, the '573 Patent clarifies that it is "important [] that the present invention is ***self-contained within a . . . housing***," again confirming Defendant's proposed construction for housing. Ex. E ('573 Patent), 6:65-67 (emphasis added).

Defendant's proposed constructions are also consistent with the asserted claim language. For example, the claims repeatedly require that the components or airway be within the housing. *See, e.g.*, Ex. B ('026 Patent), claim 7 (reciting "a fan mounted in the housing," "an air chamber positioned within the housing," "a UV light source . . . positioned in the air chamber," and "a UV light screen positioned in the air chamber"); Ex. D ('336 Patent), claim 10 (reciting "a fan mounted in the housing," "an air chamber positioned within the housing," "a UV light source . . . positioned in the air chamber," and "a UV light screen positioned in the air chamber"). This confirms that the housing is an enclosure housing the components of the device within the enclosure.

Although the other claims that use the word "housing"—the '026 Patent, claim 1 and '336 Patent, claims 1, 14—do not explicitly require the components to be "in" or within the housing, the only disclosure in these Asserted Patents that even arguably supports the claimed configuration relates to Figures 5 and 6 where *internal* baffles define airways within the housing and where the components are positioned within the housing.[3] *See, e.g.*, Ex. B ('026 Patent), Figs. 5-6, 9:39-50, 9:64-10:3, 13:50-53 (explaining that "the disclosed UV source and 'kill chamber' may be implemented in any of the embodiments disclosed herein[,]" including Figures 5 and 6); Ex. D ('336 Patent), Figs. 5-6; 9:41-52, 9:66-10:5, 13:53-56. This configuration with an internal baffle (highlighted below) within a housing is depicted below.



Ex. B ('026 Patent), Figs. 5-6; *see also* Ex. D ('336 Patent), Figs. 5-6.

---

[3] To the extent Plaintiff argues that the doctrine of claim differentiation necessitates a different construction of "housing" for these claims, this argument is without merit where, as here, to construe "housing" in such a manner would not be supported by the specification. *See, e.g.*, *Tate*, 222 F.3d at 967–68; *Edwards*, 582 F.3d at 1330, 1332.

Construing "housing" to mean "an enclosure housing the components of the air circulation device" also compels construction of the related "baffle" terms to clarify that they must be "within the housing," as depicted in Figures 5 and 6 above. The disputed "baffle" terms cover a particular baffle configuration in context of the respective asserted claims, specifically one that defines an airway between the fan and the vent, as claimed. *See* Ex. B ('026 Patent), claim 1; Ex. D ('336 Patent), claims 1, 14. The only Figures depicting a "housing" and separately a "baffle" that defines the claimed airway appears in Figures 5 and 6. Although some of other Figures, such as Figures 1-2, depict a "troffer baffle 14" as part of the housing, the "troffer baffle 14" does not define an airway between the fan and the vent, nor is it separate from the housing, both claimed requirements. A person of ordinary skill in the art would understand that the only disclosure in the Asserted Patents that even arguably supports the claimed baffle configuration relates to Figures 5 and 6.

A person of ordinary skill in the art would further understand that a broader interpretation such that the baffle could be outside the housing would not make sense, as the claimed baffle defines an airway in which the UV kill chamber (and its various components) are mounted. *See, e.g.*, Ex. B ('026 patent), claim 1 (reciting "a baffle, mounted to the housing, and defining at least a first airway between the fan and the first vent . . . a UV kill chamber mounted in the first airway"); Ex. D ('336 Patent), claim 1 (reciting "a baffle, mounted to the housing, and defining at least a first airway between the fan and the first vent . . . a UV kill chamber mounted in the first airway"), claim 14 ("a baffle defining at least a first airway between the first fan and the first vent . . . a kill chamber inside the first airway"). Such a construction would be inconsistent with the specification, which describes the housing as enclosing the components of the air circulation device, including

27

the airway and UV kill chamber. Plaintiff's approach would permit those components to exist outside the housing, contrary to the disclosed embodiments.

Accordingly, the intrinsic evidence read as a whole supports Defendant's proposed constructions.

D.    **"lower baffle configured the size of a ceiling tile" / "face-plate configured the size of a ceiling tile" / "housing configured in the shape of a housing ceiling tile"**

| "lower baffle configured the size of a ceiling tile" | |
| --- | --- |
| **UV Partners' Construction** | **GFY's Construction** |
| "lower baffle configured to correspond to a standard ceiling tile dimension"  '141 Patent, claim 11 (and all dependents thereof) | Plain-and-ordinary meaning |

| "face-plate configured the size of a ceiling tile" | |
| --- | --- |
| **UV Partners' Construction** | **GFY's Construction** |
| "face-plate configured to correspond to a standard ceiling tile dimension"  '223 Patent, claim 14 (and all dependents thereof) | Plain-and-ordinary meaning |

| "housing configured in the shape of a housing ceiling tile" | |
| --- | --- |
| **UV Partners' Construction** | **GFY's Construction** |
| "housing configured in the general shape of a standard ceiling tile"  '026 Patent, claim 1 (and all dependents thereof) | Plain-and-ordinary meaning |

The disputed terms use "size" and "shape" language without specifying how a structure matches a "ceiling tile." The intrinsic record does not impose a rigid dimensional requirement and instead reflects a range of configurations.

Here, the intrinsic evidence reflects that a "ceiling tile" is not defined by rigid dimensional equivalence across all dimensions or a uniform footprint of a ceiling tile to satisfy the disputed claim language. Rather, the specification describes ceiling tiles in a variety of configurations, demonstrating that the claimed "size" and shape" limitations are not limited to strict dimensional equivalence.

In some instances, a ceiling tile is described conventionally. For example, Figures 15-17 depict a standard ceiling tile 1501 (highlighted below) with cut-outs to receive fans 1502 and to define vents 1503. *See, e.g.*, Ex. C ('223 Patent), Figs. 15-17, 5:31-39, 12:42-48. Other components, including an upper baffle 1610, lower baffles 1620/1621, and UV light sources 1640, are mounted to the top of or above the ceiling tile. *See, e.g.*, *id.*, Figs. 15-17, 12:57-13:8, 13:37-46. The Asserted Patents explain that the ceiling tile may be formed from a wide variety of materials and configurations, including "acoustical, fiber, wood, metal, translucent, plastic, sheet rock, or drywall structures as are known to be used in industrial, commercial, or residential environments." *Id.*, 12:31-41.



*Id.*, Figs. 16B, 17 (annotated in yellow); *see also* Ex. A ('141 Patent), Figs. 15-17 (and associated descriptions); Ex. B ('026 Patent), Figs. 15-17 (and associated descriptions).

In other instances, a ceiling tile is described as a more complex structure with irregular shape and internal airflow components. *See, e.g.,* Ex. C ('223 Patent), Figs. 18-20B, Abstract, 1:19-25 ("The present inventions relate to ***ceiling tiles with built in air flow mechanisms and optional LED lighting* . . . *[and] a UV light source which decontaminates air as it flows through the ceiling tiles*** and thus helps prevent the spread of bacteria, fungus, viruses and/or mold, etc.") (emphasis added), 5:43-51, 13:39-42. For example, Figures 18-20B shown below depict a "ceiling tile 1801" defined by irregularly shaped "upper baffles 2010, 2011 and one or more lower baffles 2020, 2021, [that] act together to define one or more airway(s)" 2030/2031. *Id.*, 5:43-51, 14:21-23, 14:49-15:2; *see also supra* note 1 (a child application— Appl. No. 17/739,337 (now U.S. Patent No. 11,608,411) (Ex. I)—amending Figs. 18-20B to clarify that all these figures depict ceiling tile/panel 1801). "Upper baffles 2010, 2011 may form air deflection mechanism 2015 which is

formed in close proximity to fan 2002" that "provides the advantage of improved airflow: that is because the air diversion mechanism 2015 forces air to split evenly towards the air chambers 2030 and 2031." Ex. C ('223 Patent), 14:55-62. The upper baffles 2010/2011, lower baffles 2020/2021, and air diversion mechanism 2015 that together create a ceiling tile are highlighted below in Figure 20A.



*Id.*, Fig. 19, 20A (annotated in yellow); *see also* Ex. A ('141 Patent), Figs. 18-20B (and associated descriptions).

The specification does not impose a requirement that such structures match a uniform or full ceiling tile footprint. Instead, it explains that "ceiling tile 1801 may be sized as 1'×4'; 2'×2' or 2'×4', although a person skilled in the art would understand that any appropriately sized ceiling tile may be used in accordance with the present inventions." Ex. C ('223 Patent), 14:23–27. This disclosure confirms that the claimed "size" and "shape" limitations are not confined to exact dimensional equivalence across all dimensions.

The intrinsic evidence does not require that a "lower baffle," "face-plate," or "housing" match the full dimensions of a ceiling tile. Rather, a person of ordinary skill in the art would understand these terms to require correspondence to a ceiling tile dimension, not exact dimensional equivalence across all dimensions. Defendant's constructions reflect that understanding by

31

anchoring the claims to a recognizable ceiling tile dimension without imposing a rigid full-footprint requirement that is unsupported by the intrinsic record.

The Court should accordingly adopt Defendant's constructions.

**E.    "wherein air from the fan enters the air chamber and proceeds through the vent" / "wherein air from the fan enters the air chamber and proceeds through a vent"**

| "wherein air from the fan enters the air chamber and proceeds through the vent" | |
| --- | --- |
| UV Partners' Construction | GFY's Construction |
| "wherein air from the fan enters the air chamber and then proceeds through the vent" <br><br> '026 Patent, claim 7 (and all dependents thereof) | Plain-and-ordinary meaning |

| "wherein air from the fan enters the air chamber and proceeds through a vent" | |
| --- | --- |
| UV Partners' Construction | GFY's Construction |
| "wherein air from the fan enters the air chamber and then proceeds through a vent" <br><br> '336 Patent, claim 10 (and all dependents thereof) | Plain-and-ordinary meaning |

This dispute concerns whether the claims encompass airflow in both directions through the device, or instead require a specific direction and sequence of airflow. The claim language resolves this question.

The claims require that "air from the fan enters the air chamber and proceeds through the vent." This language imposes a clear sequence: air originates at the fan, then enters the air chamber, and then proceeds through the vent. The phrase "air from the fan" identifies the fan as the source of airflow, and the subsequent requirement that such air "enters the air chamber" and then "proceeds through" the vent establishes an ordered progression. The only reasonable reading of

32

this language is that airflow moves from the fan, into the air chamber, and then out through the vent. The claims do not recite airflow that "can" proceed in either direction, but instead define how the airflow actually proceeds.

A construction that permits airflow in the opposite direction would read the phrase "air from the fan" out of the claims. Under such a construction, air could originate elsewhere and merely pass by the fan, which is inconsistent with the claim language requiring that the air be "from the fan." The claims do not recite a bidirectional or reversible airflow system, and nothing in the claim language supports such an interpretation.

The specification confirms this reading. In every depicted and described embodiment, the fan functions as the intake and the vent as the exit, such that air flows from the fan, through the air chamber, and out through the vent. *See, e.g.*, Ex. B ('026 Patent), 6:9-15, 6:32-35, 6:56-63, 7:1-4, 7:44-47, 8:4, 8:16-19, 8:36-37, 8:42-53, 9:1-13, 9:25-27, 9:51-10:9, 10:22, 10:37-39, 10:45-46, 10:53-62, 11:7-15, 11:19-22, 12:34-36, 12:49-52, Figs. 1-17. The specification includes a single, general statement suggesting that reverse airflow may be possible. *See id.*, 12:52-54 ("A person of skill in the art would recognize that it is also possible for fan(s) 1502 and/or 1503 to be configured to act as an exhaust, rather than an intake."). However, neither the figures nor the claims cover such a configuration. *See id.*, Figs. 2, 16A.

33

**Fig. 2**



*Id.*, Fig. 2 (annotated in yellow);



*Figure 16A*

*Id.*, Fig. 16A (annotated in yellow).

This is a case where the specification acknowledges an alternative configuration, but the claims are directed to only one. *See, e.g.*, *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("Indeed, read in the context of the specification, the claims of the patent need not encompass all disclosed embodiments. Our precedent is replete with examples of subject matter that is included in the specification, but is not claimed. Therefore, the mere fact

34

that there is an alternative embodiment disclosed in the [asserted] patent that is not encompassed by [the] district court's claim construction does not outweigh the language of the claim, especially when the court's construction is supported by the intrinsic evidence.") (internal citations omitted); *Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010) ("It is not necessary that each claim read on every embodiment.").

Accordingly, the Court should adopt Defendant's constructions.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court adopt its proposed constructions for each of the disputed claim terms.

Dated:  March 31, 2026

> */s/ R. Michael Azzi*
> R. Michael Azzi (P74508)
> WARNER NORCROSS + JUDD LLP
> 150 Ottawa Ave., NW,
> Suite 1500
> Grand Rapids, Michigan 49503-2487
> 616-752-2000
> *Attorney for Defendant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that Defendant's Opening Claim Construction Brief complies with the type-volume limitation pursuant to W.D. Mich. LCivR 7.2(b)(i).  The brief contains 7837 words of Times New Roman 12-point proportional type.  The word processing software used to prepare this brief was Microsoft Word 2010.

> */s/ R. Michael Azzi*
> R. Michael Azzi (P74508)

35